# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN THE MATTER OF TAX PARCEL ）
NO. 09-008.00-001, ALSO KNOWN AS ）
1035 CREEK ROAD, NEWARK, ）
DELAWARE 19711 ）
）
SARA W.P. KRAPF, ）
）
        Petitioner, ）
）
    v. ） C.A. No. 6611-VCG
）
JAMES P. KRAPF, SR. ）
AND SUZANNE J. KRAPF, ）
and THE STATE OF DELAWARE ）
and THE ESTATE OF JUNE B. KRAPF, ）
）
        Respondents. ）

## MEMORANDUM OPINION

Date Submitted: November 24, 2014
Date Decided: January 16, 2015

William P. Brady and William L. O'Day, of WOLOSHIN, LYNCH, NATALIE & GAGNE, P.A., Wilmington, Delaware, Attorneys for Petitioner Sara W.P. Krapf.

David H. Williams, of MORRIS JAMES LLP, Wilmington, Delaware, Attorney for Respondents James P. Krapf, Sr., and Suzanne J. Krapf.

Ralph K. Durstein III, STATE OF DELAWARE, DEPARTMENT OF JUSTICE, Dover, Delaware, Attorney for Respondent State of Delaware.

GLASSCOCK, Vice Chancellor

This matter involves a melancholy family dispute over real property originally part of the homestead of the parents of the current litigants. The property was conveyed by deed to two of the Respondents, and was later, as a result of the failure of the family business, sold to the Respondent State of Delaware. The Petitioner contends that the parents' signatures in execution of the deed to the Respondents—Petitioner's brother-[1] and sister-in-law—were forged. She seeks the aid of equity to rescind this deed, as well as the subsequent deed out to the State. The State is currently using the property, located near Newark, as park land. Under the Petitioner's conception, this property would then pass under the estate of her mother-in-law. The estate is also a party respondent.[2]

The determinative issue before me is whether the deed from the parents to the Respondents is invalid as a product of forgery. That limited issue was the subject of an evidentiary hearing on October 30, 2014. The following decision is based upon my findings of fact resulting from that hearing. Because I find that the Petitioner has failed to prove forgery by evidence that is clear and convincing, the Petition to Set Aside Conveyance of Real Property is denied.

## I. BACKGROUND FACTS

The following are the facts as I find them after the evidentiary hearing.

---

[1] The Petitioner is the widow of Thomas Krapf, the brother of Respondent James Krapf.
[2] The administrator of the estate, another sibling, was one of the Respondents until a stipulation of dismissal as to him was filed in September 2011.

*A. The Disputed Land*

The land in dispute in this case once belonged to Frederic G. Krapf, Jr. ("Frederic") and his wife June Krapf ("June"). It is located on Creek Road in New Castle County near Newark (the "Creek Road Property"). Frederic and June had three children: Frederic III ("Mickey"), James ("Jimmy"), and Thomas ("Tommy.")[3]

In 1976, Frederic and June transferred to Tommy and his wife, Sara ("Sally"), the Petitioner, a portion of the Creek Road Property;[4] that portion is now identified as Tax Parcel 09-008.00-005 ("Parcel 5"). Tommy and Sally took out a loan to allow Tommy, with Jimmy's help, to build a house on the land. It was Frederic and June's intent that the other half of the Creek Road Property, now identified as Tax Parcel 09-008.00-001 ("Parcel 1"), go to Jimmy.[5] In fact, Jimmy "paid" his father for the property by allowing Frederic to retain $25,000, which otherwise would have been distributed to Jimmy in or around 1975 under the trust

---

[3] I refer to the parties by their preferred first names to prevent confusion. No disrespect is intended.

[4] *See* JX 10.

[5] There was testimony and other evidence that Frederic and June found it important to treat their children fairly. *See* Evidentiary Hr'g Tr. at 45:11–13 (Sally Krapf); *id.* 152:15–19 (Jimmy Krapf). There was also testimony that it was long-known in the family that Frederic and June's property was to go partially to Tommy and partially to Jimmy. Mickey, the eldest son, testified at his deposition that he was not interested in living on the Creek Road Property and ultimately received something of comparable value. *See* Mickey Krapf Dep. at 13:16–14:3.

of Frederic Krapf, Sr., Jimmy's grandfather.[6] Instead of contemporaneously transferring title to Jimmy, however, Frederic held the deed because of concerns that Jimmy would lose the land in a divorce or an unfortunate business deal.[7] Over the years, Jimmy, eventually with his wife Suzanne, lived in a house on the questioned land, made a number of improvements to the property, and paid property taxes, although they did not have the deed in hand.[8]

Frederic ultimately gave Jimmy the deed to Parcel 1 in 1996, naming Jimmy and Suzanne as transferees, handing it to him one day at the family's place of business, where both worked. The deed was executed, purportedly, by Frederic and June. Mickey Krapf testified at his deposition[9] that he acted as a witness to his parents' signatures on that deed, and that those signatures were genuine. As a beneficiary of a one-third interest in the residue of his mother's estate, Mickey's

---

[6] *See* Evidentiary Hr'g Tr. 142:20–143:12 (Jimmy Krapf); *see also* JX 7, JX 8, JX 9 (letters from counsel describing meetings regarding the sale of Frederic and June's property to Jimmy and Tommy). Frederic also apparently made a loan to Jimmy to finance the transfer of the property. *See* JX 9 at R-9. It was never repaid, and credible testimony elicited at the hearing suggested that Frederic and June made similar loans to their other sons with no expectation of repayment. *See, e.g.,* Evidentiary Hr'g Tr. 150:8–151:14 (Jimmy Krapf); *id.* 191:3–192:11 (Jimmy Krapf).

[7] *See* Evidentiary Hr'g Tr. 41:8–42:7 (Sally Krapf); *id.* 147:13–23 (Jimmy Krapf) (testifying that his father did not give him the deed in conjunction with the transfer of $25,000 because of his pending divorce); Mickey Krapf Dep. Tr. 18:12–19:23.

[8] Evidentiary Hr'g Tr. 153:8–154:4 (Jimmy Krapf).

[9] Mickey is a resident of Maryland and not subject to process. He chose not to testify at the hearing, and his deposition was admitted in evidence.

testimony was against his interest; if not for the transfer of the property to Jimmy, Mickey would have inherited a one-third interest in Parcel 1.[10]

Jimmy put the deed in his office, where it remained for approximately two years, until he sent it to a cousin and lawyer, Robert Krapf, to be recorded. Robert sent it back upon noticing the deed had not been notarized; Frederic and June then had the deed notarized and sent back to Robert to be filed. The deed to Jimmy and Suzanne was recorded in 1998 ("1998 Deed").

In testimony I find to be credible, Jimmy testified that he was not initially aware of the need to record the deed.[11] However, in 1998, Frederic was in need of surgery, and in anticipation of that surgery, scheduled for early July of that year, Tommy met with his father to discuss the latter's affairs. A note in Tommy's handwriting,[12] dated March 9, 1998, indicates that Frederic instructed Tommy to remind Jimmy to "get paper work so you get the farm."[13] Tommy, after speaking with his father and creating the note, spoke to Jimmy, who then sent the deed to Robert for recording. Sally disputes that this handwritten note can be interpreted to mean that Jimmy was to *record* the deed because it says "*get* the paper work,"

---

[10] Notwithstanding testimony by Tommy and Sally's son, Thomas, Jr., that Mickey had no desire to own the property, as a legal matter, Mickey's sworn testimony was against his interest, and I find it to be credible. *See* JX 26 at 3 (devising the residue of the estate to Mickey, Jimmy, and Sally, in equal shares). If the Petitioner is correct that Parcel 1 is an asset under June's estate, Mickey is a one-third owner of that property.

[11] *See* Evidentiary Hr'g Tr. 164:10–14 (Jimmy Krapf).

[12] Tommy is deceased.

[13] JX 18; *see also* Evidentiary Hr'g Tr. 164:15–165:2 (Jimmy Krapf).

4

not "*record* the paper work;" instead, she suggests, it must have meant that the deed to Jimmy was not in existence at the time the note was written in March 1998.[14] I find, however, based on Jimmy's credible testimony, that he had the deed in hand at the time Tommy created the note, which referred to the recordation of the deed.

### B. Mortgages on Parcels 1 & 5

Frederic and June, and Jimmy, Tommy, and their spouses all were active in the family construction business. In connection with that business (a well-known local construction firm, Krapfcandoit, founded by Frederic's parents) Frederic and June, as well as Jimmy and Tommy, made it a practice to encumber their own real and personal property to support lines of credit needed for various projects. This included encumbering both Parcel 1 and Parcel 5 with a $2.7 million mortgage in 1991,[15] with a subsequent $4 million mortgage,[16] used in part to satisfy the first, and with a $14 million mortgage in November 1997 that was also used in part to satisfy the $4 million mortgage.[17] The mortgages on Parcel 1 were executed by

---

[14] *See* Pet'r's Closing Arg. Mem. at 10.
[15] *See* JX 11 ($2.7 million mortgage on Parcel 1); JX 14 ($2.7 million mortgage on Parcel 5).
[16] *See* JX 20 ($4 million mortgage on Parcel 1); JX 21 ($4 million mortgage on Parcel 5).
[17] *See* JX 20 ($14 million mortgage on Parcel 1); JX 21 ($14 million mortgage on Parcel 5); Evidentiary Hr'g Tr. 159:12–160:17 (Jimmy Krapf).

Frederic and June, and the mortgages on Parcel 5 were executed by Tommy and Sally.[18]

When the business began to fail in the late 1990s, it became clear that the bank would foreclose upon encumbered property in partial satisfaction of its $14 million mortgage. Jimmy testified that because his brother Tommy was terminally ill at that time, Jimmy asked the bank not to take Tommy's house, a request with which it apparently complied.[19] Instead, the bank orchestrated the sale of other collateral, including Jimmy's home on Parcel 1 and his car.[20] The State of Delaware, one of the Respondents here, purchased the land in or around the year 2000.

Frederic died in July 1998, shortly after the surgery referred to above. Any interest he had in Parcel 1 then passed to June. June passed away on May 1, 2005, nearly seven years after the 1998 Deed was recorded, and four and a half years after the foreclosure that ultimately resulted in the sale of Parcel 1 to the State.[21] There is no evidence that, at any time prior to her death, June made any assertion

---

[18] *See* JX 11; JX 14; JX 21; JX 22. I note here that the latest mortgage, signed by Frederic and June in 1997, was entered after Frederic handed the deed over to Jimmy. But, as discussed above, it is clear that Frederic recognized that despite handing over the deed, the property was not yet in Jimmy's name, hence his instruction to Jimmy, via Tommy, to record the deed in 1998.

[19] *See* Evidentiary Hr'g Tr. 173:7–174:7 (Jimmy Krapf); Mickey Krapf Dep. at 39:13–21.

[20] *See* JX 25; *see also* Evidentiary Hr'g Tr. 171:18–172:15 (Jimmy Krapf).

[21] *See* JX 25 (showing "Jimmy Krapf's personal residence" as "sold 12/00").

that the property did not belong to Jimmy and Suzanne.[22] Mickey was the appointed personal representative under June's will and also received a one-third interest in any property included in the estate.[23] June's inventory of estate assets did not include Parcel 1.[24]

*C. Procedural History*

Petitioner Sally Krapf commenced this action in June 2011. Discovery was underway in the spring of 2012, but progress faltered; in July 2014, Respondents Jimmy and Suzanne Krapf filed a Motion to Dismiss for Failure to Prosecute. I heard oral argument on that Motion on August 25, 2014, and declined to dismiss at that time, instead putting the matter on a short path to resolution on the merits. Sally's Amended Verified Petition was filed on September 8, and the evidentiary hearing was held on October 30, with closing memoranda filed in the weeks thereafter.

Because the Petitioner's three counts—fraud, conversion of property, and conversion of equity—all rely upon a finding that the 1998 Deed was forged, I held an evidentiary hearing on that single issue. Because I find, as set forth below, that the 1998 Deed is valid, I deny the Petition to Set Aside the Conveyance.

---

[22] *See* Mickey Krapf Dep. Tr. 31:21–23. ("She was aware of the fact of the plan of dad's that the property was going to be Jimmy's.").
[23] *See* JX 26 at 12 (appointing Mickey as personal representative); *id.* at 3 (devising the residue of the estate to Mickey, Jimmy, and Sally, in equal shares).
[24] *See* JX 27.

## II. STANDARD OF REVIEW

The parties agree that the Petitioner has the burden of demonstrating forgery of the 1998 Deed by "evidence which is clear, direct, precise and convincing."[25]

## III. ANALYSIS

Both the Petitioner and the Respondents provided expert testimony as to the validity of the signatures on the 1998 Deed. While expert testimony can prove helpful, such testimony regarding forgery is not conclusive, and "cannot prevail against positive evidence of actual facts by [credible] witnesses."[26]

Both experts agreed that Frederic's signature was not likely to be genuine. The Respondents' expert opined that June's signature was valid. Once the Petitioner's expert had the opportunity to review the original 1998 Deed, the day of the evidentiary hearing, his grounds for doubting the validity of her signature, though not totally eliminated, were reduced. The Respondents' expert also opined that Mickey's witness signature was valid, and the Petitioner did not rebut this. In sum, I am left with two expert opinions that agree that Frederic's signature was probably not genuine, differ somewhat as to June's signature, and do not contest the validity of the signature of the witness. In light of the other evidence from

---

[25] *Estate of Tinley*, 2001 WL 765177, at *2 (Del. Ch. June 26, 2001); *see also* Resp't's Closing Arg. (Nov. 17, 2014) at 2; Pet'r's Reply Mem. and Closing Arg. (Nov. 24, 2014) at 1.
[26] *Will of Goldberg*, 1978 WL 22003, at *5 (Del. Ch. Feb. 9, 1978).

credible witnesses, discussed below, however, I need not rely conclusively on the experts' opinions.

First, the Respondents presented evidence that, later in his life, Frederic suffered from carpal tunnel syndrome, which necessitated he wear two supportive braces on his wrists and otherwise hampered his daily activities.[27]  He also underwent surgery for this condition at some point, though the record does not establish when.[28]  At any rate, Frederic's condition could have altered his signature.

Second, I found Mickey's testimony regarding witnessing his parents' signatures on the 1998 Deed to be credible.[29]  Mickey testified that Frederic as well as June executed the 1998 Deed.  Notably, Sally's sons, Thomas, Jr. ("T") and John, testified that Mickey stated, upon seeing the deed, that the signatures did not appear genuine.  These statements, of course, unlike Mickey's testimony, are self-interested.  To the extent that John and T's testimony is inconsistent with Mickey's, I find Mickey more credible.  Next, Sally points to actions by Mickey which she contends were inconsistent with this testimony.  First, she emphasizes that Mickey failed to announce to her that he had witnessed the signatures until his deposition in 2013, even though he knew that T was alleging the inauthenticity of

---

[27] Evidentiary Hr'g Tr. 175:11–176:16, 177:18–179:8 (Jimmy Krapf); *see also* JX 28.

[28] Evidentiary Hr'g Tr. 176:2–16 (Jimmy Krapf).

[29] *See* Mickey Krapf Dep. Tr. 24:9–16 ("Q. Now, did your father sign it in your presence?  A. Yes.  Q. Do you recognize this to be his signature?  A. Yes, I do.  Q. How about your mother? A. That's absolutely her signature.").

those signatures as early as 2008. Similarly, she points out that Mickey assisted T by providing handwriting exemplars for June and Frederic at T's request, despite knowing that T wanted them because he thought the signatures on the 1998 Deed were forged. I find the Petitioner's argument that these actions impeach Mickey's testimony unpersuasive.[30] Mickey's testimony was that he wished to remain aloof from the dispute between T and Jimmy; I find this credible and sufficient to explain his actions here. In short, Mickey's testimony, against self-interest, is persuasive.

Third, the Petitioner presented no evidence to suggest that the notarization was false or otherwise invalid.[31] This Court has held that:

> An acknowledgment of a signature by a notary gives rise to a presumption of the genuineness of that signature. This presumption flows from a notary public's duty, in making an acknowledgment, to determine that the person who signs the document is the person whose signature appears on the document.[32]

---

[30] I also find it incongruous for the Petitioner to argue that Mickey should have spoken up sooner about his role as a witness of the 1998 Deed, in light of the fact that the questioned deed was recorded in 1998 and the Petitioner did not file this suit until 2011, even though there was *at least* occasion to consider the status of the property upon the administration of June's estate in 2005, when the property was not included in the inventory.

[31] The Amended Petition stated that the notarial officer was an employee of Jimmy's. *See* Am. Petition ¶ 25; Answer of Resp'ts James P. Krapf, Sr. and Suzanne J. Krapf ¶ 25. If the Petitioner meant to imply that this relationship made the notarization defective, such a theory was not developed, and I do not so find.

[32] *City Investing Co. Liquidating Trust v. Cont'l Cas. Co.*, 1992 WL 65411, at *6 (Del. Ch. Mar. 30, 1992) (citation omitted), *aff'd,* 624 A.2d 1191 (Del. 1993).

The duties of a notary public of this State are set forth by statute.[33]  Relevant here, a notarial officer is tasked with "determin[ing], either from personal knowledge of identity or from satisfactory evidence of identity, that the person appearing before the officer and making the acknowledgment is the person whose true signature is on the instrument."[34]  An "acknowledgment" is:

> a statement by a person that the person has executed an instrument for the purposes stated therein. If the instrument is executed in a representative capacity, an acknowledgement certifies that the person who signed the instrument did so with proper authority and executed the instrument as the act of the person or entity stated therein.[35]

I presume, therefore, that Frederic and June both acknowledged, before the notary in 1998, that they had placed their signatures on the Deed in execution of that instrument in 1996.  Accordingly, even if Frederic's signature on the 1998 Deed was not his own—which, in light of the evidence, including Mickey's testimony, and despite the expert testimony, I do *not* find to have been proved—I find that he ratified that signature when he caused the deed to be notarized in 1998 and thereby acknowledged it to a notarial officer whose statutory duties allow for a presumption of genuineness of an acknowledged signature.  Finally, I note that Jimmy and Mickey's testimony that Frederic and June intended for Jimmy to receive Parcel 1, together with Jimmy's credible testimony that he paid for the parcel when he forwent his inheritance from his grandfather in favor of his father

---

[33] *See* 29 *Del. C.* § 4322.
[34] *Id.*
[35] *Id.* § 4321.

11

and that he paid the taxes on and improved Parcel 1 at his own expense, are consistent with a transfer of the property from Frederic and June to Jimmy and Suzanne.

Because I find the 1998 Deed valid, I need not consider any of the Respondents' affirmative defenses, including whether the Petitioner's delay in seeking relief implicates the doctrine of laches, whether the State of Delaware's status as a good faith purchaser for value prevents the remedy the Petitioner seeks, and whether the alternative remedy of money damages is unavailable in light of the fact that the encumbrances on the land at the time of June's death exceeded its value.

## IV. CONCLUSION

For the foregoing reasons, I find that the Petitioner has not established by evidence that is clear, direct, precise, and convincing that the signatures in execution of the 1998 Deed were forged, or that the Deed is otherwise invalid. Consequently, the Petition to Set Aside Conveyance of Real Property is denied.[36]

An appropriate order accompanies this Memorandum Opinion.

---

[36] In written closing argument, Jimmy and Suzanne sought an award of attorney's fees from the Petitioner. That request is denied.

12

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

IN THE MATTER OF TAX PARCEL )
NO. 09-008.00-001, ALSO KNOWN AS )
1035 CREEK ROAD, NEWARK, )
DELAWARE 19711 )
)
)
SARA W.P. KRAPF, )
)
        Petitioner, )
)
    v. ) C.A. No. 6611-VCG
)
JAMES P. KRAPF, SR. )
AND SUZANNE J. KRAPF, )
and THE STATE OF DELAWARE )
and THE ESTATE OF JUNE B. KRAPF, )
)
        Respondents. )

## ORDER

AND NOW, this 16th day of January, 2015,

The Court having considered the Amended Verified Petition to Set Aside Conveyance of Real Property, and for the reasons set forth in the Memorandum Opinion dated January 16, 2015, IT IS HEREBY ORDERED that the Petition is DENIED.

SO ORDERED:

                           /s/ Sam Glasscock III
                           Vice Chancellor

13